1

2

3

4

5

6                           UNITED STATES DISTRICT COURT

7                                 DISTRICT OF NEVADA

8                                        * * *

9   JANET SOBEL, DANIEL DUGAN, Ph.D.,      )
    LYDIA LEE, and MARK SINGER,            )
10  individually and on behalf of all others )        3:06-CV-00545-LRH-RAM
    similarly situated,                    )
11                                         )
                   Plaintiffs,             )        ORDER
12                                         )
    v.                                     )
13                                         )
    THE HERTZ CORPORATION, a Delaware      )
14  Corporation, ENTERPRISE LEASING        )
    COMPANY-WEST, LLC, a Delaware LLC,     )
15  and VANGUARD CAR RENTAL USA, LLC, )
    a Delaware LLC,                        )
16                                         )
                   Defendants.             )
17                                         )
    _____)
18

19          Before the court are three motions: (1) Plaintiffs' Motion for Final Approval of the

20  Settlement (#185[1]); (2) Plaintiffs' Motion for Attorneys' Fees, Expenses, and Incentive Awards

21  (#186); and (3) Objector Scott Schutzman's Motion to Intervene (#199).  For the reasons stated on

22  the record during the fairness hearing on May 17, 2011 (#245-246), and for the reasons stated

23  below, the court will deny final approval of the proposed settlement.  Accordingly, Plaintiffs'

24  motion for attorneys' fees, expenses and incentive awards will be denied as moot, and Objector's

25  _____

26          [1]Refers to court's docket entry number.

1   motion to intervene will be denied without prejudice.

2   **I.      Facts and Procedural History**

3           This is a putative class action filed on behalf of persons who have rented cars at the Reno

4   and Las Vegas international airports from three national rental car companies: Hertz (also d.b.a.

5   Advantage), Enterprise, and Vanguard (d.b.a. National and Alamo).  Plaintiffs allege that in return

6   for the right to operate on-site at the Reno and Las Vegas international airports, rental car

7   companies are required to pay a percentage of their gross revenues to the airports as concession

8   fees.  As a means of recouping these ordinary operating expenses, the companies pass along the

9   fees to their customers as surcharges labeled "concession recovery fees."[2]  At all relevant times, the

10  companies "unbundled" the surcharges from the base rental rate, such that the base rental rate

11  quoted to customers did not include the additional airport "concession recovery fee," which was

12  itemized separately in the rental agreement.  Plaintiffs allege this practice violates both NRS

13  § 482.31575 and Nevada's Deceptive Trade Practices Act ("DTPA").  In addition, Plaintiffs allege

14  a claim for unjust enrichment.  Defendants deny these claims.

15          This case was filed on October 13, 2006, by individual plaintiffs Janet Sobel, Daniel Dugan,

16  Ph.D., and Lydia Lee, and against defendants Hertz and Enterprise.  Early on, Lee and Enterprise

17  were voluntarily dismissed without prejudice and entered into a tolling agreement.  Following the

18  court's denial of Hertz' motion to dismiss and the Ninth Circuit's denial of interlocutory review,

19  the court approved the parties' stipulation to bifurcation of liability and damages and to defer class

20  certification proceedings.  Plaintiffs then completed liability discovery against Hertz, including

21  depositions of both fact and expert witnesses.

22          On March 17, 2010, this court entered an order (#111) granting in part and denying in part

23

24          [2]Hertz charged Plaintiff Sobel, who rented her vehicle from the McCarran International Airport

25  in Las Vegas, a concession recovery fee of 10%.  Hertz charged Plaintiff Dugan, who rented his vehicle
    from the Reno-Tahoe International Airport in Reno, a concession recovery fee of 11.54%.

26

the parties' cross-motions for summary judgment.  The court rejected Plaintiffs' DTPA claim, finding that Hertz had violated NRS § 482.31575, and denied both parties' motions on the unjust enrichment claim because neither party had provided to the court the full terms and conditions of the rental agreements.  Given the determination that Hertz had violated NRS § 482.31575, the court permitted discovery to proceed on the issue of damages.  But the court rejected plaintiffs' claim for injunctive relief because the challenged practice is no longer illegal given amendments to the statute effective October 1, 2009.

Following the court's ruling, Plaintiffs Sobel and Dugan filed a motion for class certification (#112) on behalf of all Hertz customers who were charged a concession recovery fee at Nevada airports between October 13, 2003 and September 20, 2009.  Also, Plaintiff Lee reinstated her action against Enterprise by filing a new complaint, docketed as Case No. 3:10-cv-326-LRH-VPC.  That complaint was further amended on July 22, 2010, adding new plaintiff Mark Singer and new defendant Vanguard, an affiliate of Enterprise that rented cars at Nevada airports under the Alamo and National brands.  The named plaintiffs thus included four individuals—Sobel, Dugan, Lee, and Singer—while the named defendants included three entities—Hertz (also d.b.a. Advantage), Enterprise, and Vanguard (d.b.a. National and Alamo).

On June 2, 2010, the parties participated in a 12-hour mediation session before the Hon. Ronald Sabraw (retired) of JAMS.  Further negotiations, some through the mediator and other directly between opposing counsel, led to a Memorandum of Understanding containing the material terms of a settlement, which was signed by all parties in July 2010.  On July 20, 2010, the court approved the parties' stipulation staying all litigation pending further negotiations, documentation and court approval of a class action settlement.

As a result of the parties' successful negotiations, on October 5, 2010, Plaintiffs filed a motion (#123) seeking (1) preliminary approval of the settlement, (2) conditional certification of the settlement class, (3) approval of the form and manner of notice to the settlement class and the

procedures for class members to register for settlement benefits, and (4) a schedule for proceedings leading to final approval of the settlement—all stipulated to by the parties for purposes of settlement only.  Responsive memoranda in support of Plaintiffs' motion were accordingly filed by Defendant Hertz (#125) and Defendants Enterprise and Vanguard (#127) on October 22, 2010.

Also on October 22, 2010, the parties filed a joint stipulation to consolidate the *Sobel* and *Lee* cases for purposes of settlement, to permit the filing of a consolidated Second Amended Class Action Complaint under Case No. 3:06-cv-545, and to stay all proceedings (except those relating settlement) pending final approval of the proposed settlement.  The court approved the stipulation by order of October 29, 2010 (#132), following which Plaintiffs filed their Second Amended Complaint (#133) on November 5, 2010.

On November 9, 2010, the court held a hearing on Plaintiffs' Motion for Preliminary Approval of Settlement, Conditional Certification of the Settlement Class, Approval of the Form of Notice, and Memorandum in Support (#123).  Supporting memoranda were also filed by Defendant Hertz (#125) and Defendants Enterprise and Vanguard (#127).  At the hearing, the court heard arguments and took the matter under submission (#134).  Two weeks later, on November 23, 2010, the court entered two orders granting conditional certification of the settlement class (#135) and granting preliminary approval of the settlement and approving the form of notice (#136).  In particular, the court (1) conditionally certified the Settlement Class under Fed. R. Civ. P. 23(b)(3), "in connection with and solely for purposes of settlement"; (2) appointed as Class Representatives the named plaintiffs, Janet Sobel, Daniel Dugan, Ph.D., Lydia Lee and Mark Singer; (3) appointed as Class Counsel the Law Office of David Zlotnick; Berger & Montague, P.C.; and Robertson & Benevento; (4) preliminarily approved the Settlement; (5) entered a scheduling order for Plaintiffs' motions for final approval, attorneys' fees, and incentive awards (March 24, 2011); Defendants' papers in support (April 4, 2011); Opt-outs and Objections (April 8, 2011); replies in support of the settlement (April 28, 2011); the Fairness Hearing (May 17, 2011); and Registration for benefits (60

1  days after the Fairness Hearing); and (6) approved the form and manner of the Notice to the

2  Settlement Class.

3       From February 7 to 18, 2011, nearly 2.5 million (exactly 2,497,360) notices were sent to

4  Settlement Class members.  Of those, 1,217,894 notices were mailed or emailed to customers of the

5  Hertz and Advantage brands, *see* Doc. #229, p. 3; and 1,279,466 notices were mailed to customers

6  of the Alamo, Enterprise and National brands, *see* Doc. #181, p. 2.

7       Settlement Class members have been able to register for benefits through the settlement

8  website since the notices were distributed.  As of mid-April, nearly 84,000 registrations had been

9  processed through the settlement website—35,482 for Hertz and Advantage, plus 48,446 for

10  Alamo, Enterprise and National.  *See* Doc. #229, p. 3; Doc. #226, p. 1.  Additionally, 2,068 opt-

11  outs had been processed for Hertz and Advantage.  *See* Doc. #229, p. 3.  No opt-out figures were

12  provided as to the Alamo, Enterprise and National brands.  The deadline for benefits registration is

13  60 days after the fairness hearing scheduled for May 17, 2011.

14       Following the distribution of the notices, the court also received several filings from

15  settlement class members in opposition to approval of the settlement.  One such objector, Scott

16  Schutzman, also filed a Motion to Intervene (#199), which the class plaintiffs and defendants

17  oppose.  The court also received filings from the United States (#243) and the Nevada System of

18  Higher Education (#203) seeking exclusion from the settlement class of the governmental entities

19  and their employees and contractors who were reimbursed for work-related car rentals involving

20  the payment of unbundled concession recovery fees.  Plaintiffs have agreed to exclude the

21  governmental entities but oppose the exclusion of their employees and contractors.

22       On May 17, 2011, the court held a fairness hearing on Plaintiffs' Motion for Final Approval

23  of the Settlement (#185).  After hearing arguments from the class plaintiffs, defendants, and

24  appearing objectors, the court indicated that the motion for final approval would be denied, with a

25  written order addressing all pending motions to follow.  *See* Doc. #245; Doc. #246, pp. 78-85.

26

**II.    Settlement Agreement**

    **A.  Settlement Class**

        The Settlement Class includes "all renters who were charged one or more Airport

Concession Recovery Fee(s)" for car rentals at the Reno-Tahoe and McCarran International

Airports by (1) Hertz from October 13, 2003 through September 30, 2009[3]; (2) Hertz/Advantage

from July 1, 2009[4] through September 30, 2009; (3) Enterprise from June 3, 2004 through

September 30, 2009; (4) Vanguard (d.b.a. Alamo or National) from June 3, 2007 through

September 30, 2009.  Doc. #135, p. 2  Excluded are Defendants and their affiliates, Plaintiffs'

counsel, and "all judicial officers responsible for any decisions in this matter."  *Id.* at 2-3.

Following the objections of the United States and the Nevada System of Higher Education,

Plaintiffs now propose to also exclude any governmental entities, while including government

employees and contractors.  *See* Doc. #223.

    **B.  Settlement Relief**

        This is strictly a coupon settlement.  There is no settlement fund or any provision for cash

payments to the Settlement Class (except incentive awards to the Class Representatives).  Instead,

each Defendant would issue a coupon to each of their respective customers for a discount on a

future car rental.  Class members with one or two rentals during the class period would receive a

$10 coupon from the company they rented from, and customers with three or more rentals would

receive a $20 coupon.  For example, a customer of National who rented twice during the class

period and was charged an airport concession fee would receive one $10 coupon from Defendant

Vanguard toward a future rental from its National brand.  *See* Doc. #123-1, pp. 9-11.

        The coupons would be redeemable only with the issuing company but at any of its U.S.

---

[3]The cut-off is September 30, 2009 with respect to all Defendants, because the statutory amendment legalizing Defendants' conduct was made effective October 1, 2009.

[4]Hertz acquired Advantage on July 1, 2009.

1  locations, subject to availability and standard rental qualifications.  Also, the coupons would be

2  redeemable with all other discounts, valid for 18 months from the date of issuance, non-

3  transferrable except to immediate family members, and would have no cash value.  *Id.* at 11.

4      Defendants have administered the notification and registration process for class members.

5  Putative class members have been identified and notified based on the Defendants' rental records.

6  Notification has occurred by email and by U.S. mail where email is impossible or undeliverable.

7  All notified customers who have not withdraw from the class are considered members of the

8  settlement class and would be bound by the settlement; however, to receive settlement benefits

9  those members must register at a dedicated website within 60 days following the fairness hearing.

10  Subject to certain restrictions, Defendants shall bear the costs of providing notice to the class and

11  administering the Settlement Agreement.  *Id.* at 12.

12      **C.  Attorneys' Fees and Costs**

13      The Settlement Agreement includes a so-called "clear sailing" provision, whereby

14  Defendants have agreed not to oppose Class Counsel's request for fees and costs, so long as the

15  request does not exceed $1.44 million, of which costs are capped at $150,000.  *See* Doc. #123-1,

16  pp.12-13.  Accordingly, Class Counsel have moved for the maximum $150,000 in costs and $1.29

17  million in attorney's fees, based on a lodestar calculation method under 28 U.S.C. § 1712(b).  Doc.

18  #186.  Class Counsel claim that based on present time expended and costs incurred, they have a

19  combined lodestar of $1,409,967.50 in fees based on 3,158.65 hours of work performed (averaging

20  $446.38 per hour), plus $150,838.63 in costs, for a total of over $1.56 million.  Thus, based on

21  Class Counsel's calculations, as of the filing of their motion three months ago, they had already

22  exceeded the $1.44 million cap on attorneys' fees and costs by over $120,000.

23      **D.  Incentive Awards to the Class Representatives**

24      The Settlement Agreement provides that, "subject to Court approval, Defendants shall

25  collectively pay a single incentive award of an amount not to exceed $20,000.  Such award shall be

26

1  allocated among the Representative Plaintiffs by Plaintiffs' Counsel as directed by the Court."

2  Doc. #123-1, p. 13.  Accordingly, Plaintiffs have moved for the maximum $20,000 incentive

3  award, with a proposed allocation to the Class Representatives as follows: $7,500 each to plaintiffs

4  Sobel and Dugan, $3,000 to plaintiff Lee, and $2,000 to plaintiff Singer.  Doc. #186, p. 7.

5  **III.    Final Approval of Class Settlement**

6       **A.  Legal Standard**

7       Rule 23 of the Federal Rules of Civil Procedure mandates judicial review of any settlement

8  of the "claims, issues, or defenses of a certified class."  Fed. R. Civ. P. 23(e).  Determining whether

9  to approve a proposed class action settlement is generally a two-step process.  *See* Fed. Judicial

10 Center, *Manual for Complex Litig.* § 21.632 (4th ed. 2004).  First, the court conducts a preliminary

11 fairness evaluation.  *Id.*  In doing so, where the parties seek class certification and settlement

12 approval at the same time, the court makes a "preliminary determination that the proposed class

13 satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)."  *Id.*

14 The court then makes a "preliminary determination of the fairness, reasonableness, and adequacy of

15 the settlement terms and must direct the preparation of notice of the certification, proposed

16 settlement, and date of the final fairness hearing."  *Id.*

17      Once the court is satisfied as to the certifiability of the class and the fairness,

18 reasonableness, and adequacy of the proposed settlement, notice of a formal Rule 23(e) fairness

19 hearing is given to the class members.  *Id.* at § 21.633.  The notice should let the class members

20 know that the hearing will permit them the opportunity to voice their opinions on the proposed

21 settlement.  *Id*.  It should also inform them that they may file written objections to the settlement

22 and that those who do so may appear at the hearing.  *Id.*

23      At the final fairness hearing, the proponents of the settlement must demonstrate that the

24 settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The parties may present

25 witnesses, experts, and affidavits or declarations, and class members may also appear and testify.

26

8

*Manual for Complex Litig.* § 21.634.  Regardless of the amount of opposition to the settlement agreement, the court must make an independent analysis of the settlement terms and examine whether the interests of the class are better served by the proposed settlement than by further litigation.  *Id.* § 21.61.

To determine whether the settlement is fair, adequate, and reasonable, the court considers several factors, including (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.  *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1385 (9th Cir. 1993).  These factors are not exclusive, and some may warrant more weight than others depending on the circumstances.  *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

Plaintiffs argue that a presumption of fairness should apply here because "the settlement agreement was reached in arm's length negotiations after relevant discovery [has] taken place."  *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1171 (S.D. Cal. 2007).  Plaintiffs fail to acknowledge, however, that when settlement negotiations were pursued, discovery had only just begun as to damages—the very issue that the parties tout as presenting the greatest weakness in Plaintiffs' case, thereby diminishing the case's value and necessitating settlement.  Because highly relevant discovery had not in fact taken place, it is highly doubtful that a presumption of fairness should apply here.

Further undermining the appropriateness of a presumption of fairness is the fact that this settlement was negotiated prior to the court certifying the class.  Indeed, because of "the special difficulties the court encounters with its duties under Rule 23(e)" in approving pre-certification settlements, "many courts have required the parties to make a *higher* showing of fairness to sustain

1   these settlements." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*,

2   55 F.3d 768, 805 (3d Cir. 1995) (hereinafter *In re GMC*) (emphasis added).  Courts must be "even

3   more scrupulous than usual in approving settlements where no class has yet been formally

4   certified." *Id.*

5          Finally, special considerations arise in cases involving coupon settlements.  The Class

6   Action Fairness Act of 2005 (CAFA) includes an express requirement that "the court may approve

7   the proposed [coupon] settlement only after hearing to determine whether, and making a written

8   finding that, the settlement is fair, reasonable, and adequate for class members."  28 U.S.C. §

9   1712(e).  Although this "fair, reasonable, and adequate" standard is identical to that contained in

10  Rule 23(e)(2), "several courts have interpreted section 1712(e) as imposing a heightened level of

11  scrutiny in reviewing such [coupon] settlements." *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d

12  1052, 1069 (C.D. Cal. 2010) (citing *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646,

13  654 (7th Cir. 2006); *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1321 (S.D. Fla.

14  2007)); *see also* S. Rep. No. 109-14, at 27 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 27 (stating

15  that Section 5 of CAFA "requires greater scrutiny of coupon settlements").  Likewise, Rule 23 itself

16  may require closer scrutiny of coupon settlements.  *See* Fed. R. Civ. P. 23(h), 2003 Advisory

17  Committee Notes ("Settlements involving non-monetary provisions for class members also deserve

18  careful scrutiny to ensure that these provisions have actual value to the class.").  Coupon

19  settlements are "generally disfavored" due to three common problems: (1) they often do not

20  provide meaningful compensation to class members; (2) they often fail to disgorge ill-gotten gains

21  from the defendant; and (3) they often require class members to do future business with the

22  defendant in order to receive compensation.  *True*, 749 F. Supp. 2d at 1069.  Accordingly, before

23  granting final approval, the court "must discern if the value of a specific coupon settlement is

24  reasonable in relation to the value of the claims surrendered."  *Id.*; *see also* 28 U.S.C. § 1712(d)

25  (authorizing the court to receive expert testimony "on the actual value to the class members of the

26

10

1  coupons that are redeemed").

2  **B.  Fairness, Reasonableness, and Adequacy of the Settlement**

3  **1.  Strength of Plaintiffs' Case**

4  Although not stated explicitly, the essential position of the settlement parties is that the

5  weakness of Plaintiffs' case going forward alone justifies approval settlement, seemingly regardless

6  of the value of the relief obtained.  Little regard is given to this court's ruling that Hertz violated

7  NRS § 482.31575 by unbundling concession recovery fees from the base rate.  The parties instead

8  argue that, notwithstanding the court's ruling, Plaintiffs face a substantial risk that they would be

9  unable to obtain any monetary recovery were the litigation to continue.  They cite several reasons.

10  First, Enterprise and Vanguard note that the court's ruling on summary judgment applied

11  only to Hertz, and they claim to have strong arguments for why no violation of NRS § 482.31575

12  occurred notwithstanding the court's contrary ruling.  Doc. #194, p. 3.  Enterprise and Vanguard

13  appear to rely on the same arguments the court already rejected, however.  The only argument that

14  appears new is that the statute should be interpreted in light of the failure of proposed legislation

15  that would have prohibited more expressly the unbundling of airport concession recovery fees.  *Id.*

16  at 3 & n.4.  The court is skeptical, however, that such an argument would compel a different result,

17  particularly in light of the court's determination on summary judgment that the Nevada Legislature

18  intended to change, not clarify, existing law with the 2009 amendment to § 482.31575 legalizing

19  the practice of unbundling airport concession recovery fees.  *See* Doc. #111, pp. 8-11.  The failure

20  of other proposed legislation is unlikely to change that analysis.

21  Second, the parties note that the court's interpretation of former § 482.31575 as prohibiting

22  the unbundling of concession recovery fees would be subject to de novo review on appeal.

23  Reversal on appeal is an ever-present litigation risk that negatively affects the probable value of

24  Plaintiffs' claims.  Adding to that effect is the court's recognition in its prior rulings that the statute

25  in question is "ambiguous and poorly-drafted" and the fact that resolution of the statute's "several"

26

11

1    ambiguities involved substantial analysis of the statutory text and legislative history.  Doc. #22, p.

2    3.  Nonetheless, to say that appellate reversal is possible is not to say that it is likely or that the

3    claims are weak or of negligible value.  *See True*, 749 F. Supp. 2d at 1073; *Figueroa*, 517 F. Supp.

4    2d at 1324.  While Plaintiffs may wish to avoid the risk of reversal on appeal, Defendants face an

5    equal if not greater risk this court's rulings would be affirmed, and at greater expense.  Having won

6    partial summary judgment as to liability under § 482.31575, Plaintiffs are in a position of strength,

7    not weakness.

8        Third, the court's ruling on summary judgment was not entirely in Plaintiff's favor.

9    Although the court granted partial summary judgment to Plaintiffs as to Hertz' violation of NRS

10   § 482.31575, the court simultaneously granted partial summary judgment to Hertz as to Plaintiffs'

11   DTPA claim and denied summary judgment to either party as to Plaintiffs' unjust enrichment

12   claim.  *See* Doc. #111.  The status of Plaintiffs' claims is thus a mixed bag.  They have lost the

13   DTPA as a potential avenue for monetary recovery, their unjust enrichment claim is alive but of

14   uncertain status, and they have obtained a determination that Hertz violated NRS § 482.31575—a

15   determination that would likely be extended to defendants Enterprise and Vanguard.

16       Fourth, given the court's finding of a violation of NRS § 482.31575, the parties not

17   surprisingly place great emphasis on the argument that it would be difficult, if not impossible, for

18   Plaintiffs to prove actual injury and proximate causation in order to obtain monetary damages under

19   NRS § 482.31585 (granting a private right of action "for the recovery of damages and appropriate

20   equitable relief for any violation" of § 482.31575).  Defendants argue that to recover damages,

21   "Plaintiffs would have to show that if the airport concession recovery fee had been included in the

22   base rate, they would not have rented a vehicle or would have rented it at a lower price."  Doc.

23   #194, p. 4.

24       The court is not so quick to accept Defendants' argument.  To begin, the court has not been

25   presented with any substantial, balanced analysis on the issue of damages; the one-sided

26

1   presentation in the papers supporting settlement approval hardly qualifies.  Given the court's

2   independent duty to ensure the fairness, reasonableness, and adequacy of a class settlement, the

3   court will not accept on suggestion alone the notion that Plaintiffs' claims are weak simply because

4   the Defendants have identified a colorable defense.  "That the claims are contested . . . is not to say

5   the claims are weak." *Figueroa*, 517 F. Supp. 2d at 1324.  Furthermore, even considering the

6   parties' limited and one-sided briefing the court has received regarding Defendants' damages

7   theory, the court is not convinced it would carry the day.  Defendants argue they could have simply

8   bundled the concession recovery fee and advertised, quoted and charged a higher base rate without

9   affecting rentals or total rental rates.  But there are obvious problems with this theory.

10          For instance, Defendants essentially argue that the sheer pervasiveness of the unlawful

11   conduct precludes any damages award.  That is, Plaintiffs cannot show that they could have

12   obtained a better rate elsewhere because every rental car company was violating NRS § 482.31575.

13   Yet the court has been presented with no evidence establishing that every on-site rental car

14   company at the Reno-Tahoe and Las Vegas airports was engaged in the same unlawful practice of

15   unbundling airport concession recovery fees.  It might instead be the case that one or more on-site

16   rental car companies did not engage in the same unbundling practices, and Defendants were

17   unbundling their airport concession recovery fees to attract customers with the false appearance of

18   competitive base rates.

19          But even if it were the case that "everyone was doing it," the court is skeptical of that

20   argument as a viable damages defense.  Surely the Defendants are not suggesting that so long as

21   everyone is violating consumer protection laws in the same manner, all are immune from paying

22   damages because the consumers would have encountered the same unlawful conduct had they gone

23   elsewhere.  Such a rule would render the law toothless and negate its purpose of consumer

24   protection.  Furthermore, the court views as somewhat unrealistic Defendants' assertion that the

25   uniformity of the practice in the industry would have allowed them to charge the same airport

26

13

1    concession recovery fee and total rental rate even if they had complied with the statute's bundling

2    requirement.  Quoting a higher, bundled base rate would potentially result in the loss of customers

3    to non-compliant competitors still unlawfully advertising a lower, unbundled base rate, or to off-

4    airport competitors who do not charge any airport concession recovery fee.  To remain competitive

5    in a price-sensitive industry, the compliant company would therefore be forced to reduce its

6    advertised base rate and, by extension, the bundled concession recovery fee it charged.

7        Defendants' argument also ignores a significant portion of the relevant competition—off-

8    site car rental companies not charging airport concession recovery fees.  While some consumers are

9    surely willing to pay an extra surcharge for the convenience of renting at the airport, other more

10   price-conscious consumers might avoid such surcharges if they can obtain a lower rate elsewhere.

11   By advertising an unbundled base rate, Defendants' base rates would have appeared comparable to

12   rates charged at off-site locations, when in fact Defendants were illegally adding unbundled airport

13   concession recovery fees to the total rental rate.  Seeking to obtain the best of both worlds—a

14   comparable base rate and the convenience of renting at the airport—the price-conscious consumer

15   might have rented from one of the Defendants under the mistaken belief that the total rental rate

16   was truly comparable based on the advertised base rate.

17       Finally, Defendants maintain that proof of damages is the only avenue for obtaining

18   monetary recovery because equitable relief, such as restitution or disgorgement, is not recoverable.[5]

19   *See* Doc. #231, pp. 3-5.  The court's rejection of Plaintiffs' DTPA claim does not foreclose the

20   availability of equitable relief, however.  Quite apart from the court's holding that Hertz'

21   unbundling did not constitute a violation of Nevada's DTPA, the court also held that such practices

22

23   _____

24       [5]The court has previously held that injunctive relief is unavailable due to the 2009 amendments
     to NRS § 482.31575 legalizing Defendants' unbundling practices.  However, the unavailability of such
25   relief is irrelevant to the potential monetary value of Plaintiffs' claims or the reasonableness of the
     settlement.  As the settlement contains no provisions requiring Defendants to alter their business
26   practices, there is no advantage or disadvantage to settling insofar as injunctive relief is concerned.

did constitute a violation of NRS § 482.31575, for which NRS § 482.31585 expressly authorizes "the recovery of damages and appropriate equitable relief."  While Defendants may contest the Plaintiffs' claims for equitable relief under § 482.31585, that does not render the claims weak or negate their settlement value.  *See True*, 749 F. Supp. 2d at 1073; *Figueroa*, 517 F. Supp. 2d at 1324.  "A colorable claim may have considerable settlement value (and not merely nuisance settlement value) because the defendant may no more want to assume a nontrivial risk of losing than the plaintiff does."  *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 783 (7th Cir. 2004).  The court has never addressed the asserted unavailability of restitution or disgorgement as a remedy in this case, and the unavailability of which is hardly a forgone conclusion.

### 2.     Risk, Expense, Complexity, and Likely Duration of Further Litigation

Notwithstanding the relatively advanced stage of these proceedings, *see* Part 5 *infra*, extensive further litigation would remain to be conducted if the settlement were to be rejected, including re-certification of the class, discovery and litigation on the issue of damages, and an inevitable appeal.  Further litigation would, in all probability, be highly contested, risky, lengthy, and expensive to both sides, with any recovery further delayed by any appeals.  By contrast, the proposed settlement would provide for immediate recovery, thereby efficiently and quickly resolving the dispute while guaranteeing some recovery to the class.  This factor therefore weighs in favor of approval.

### 3.     Risk of Gaining Class Certification and Maintaining Class Action Status Throughout the Trial

The class has been conditionally certified for settlement purposes only, and if the settlement is not approved certification of a litigation class would be contested.  The fact that class certification and maintaining class status is "not a foregone conclusion" weighs somewhat in favor of approval of the settlement.  *Staton v. Boeing Co.*, 327 F.3d 938, 962 (9th Cir. 2003).  At the same time, however, the parties have not presented any compelling reasons to significantly doubt

1   the likelihood that Plaintiffs would be unable to satisfy the requirements for certification of the

2   class under Rule 23(a) and (b), particularly given the court's existing findings supporting

3   certification of the settlement class. "It is true that settlement can reduce the differences among

4   class members. But . . . the standard for certification is the same for settlement classes as for

5   conventional classes." *In re GMC*, 55 F.3d at 818. Plaintiffs specifically note that Defendants may

6   challenge certification on the grounds that reliance on Defendants' quoted base prices and

7   calculation of damages presented individualized issues. Doc. #185, p. 12. However,

8   individualized issues of causation, reliance, and damages do not ordinarily preclude class

9   certification. *In re GMC*, 55 F.3d at 817. Furthermore, if the litigation class were certified, there

10   do not appear to be any issues that would undermine maintenance of the class action throughout

11   trial. The court therefore finds that the risks of achieving and maintaining class certification are not

12   so substantial as to weigh in favor of settlement.

13              **4.    Amount Offered in Settlement**

14        As noted above, in order to determine that a coupon settlement is fair, reasonable, and

15   adequate for class members under Rule 23(e)(2) and § 1712(e) of CAFA, the court "must discern if

16   the value of a specific coupon settlement is reasonable in relation to the value of the claims

17   surrendered." *True*, 749 F. Supp. 2d at 1069. "In ascertaining the fairness of a coupon settlement,

18   the Court is to 'consider, among other things, the real monetary value and likely utilization rate of

19   the coupons provided by the settlement.'" *Id.* at 1073 (quoting S.Rep. No. 109-14, at 31, *reprinted*

20   *in* 2005 U.S.C.C.A.N. 3, 31). To that end, CAFA provides that "the court may, in its discretion

21   upon the motion of a party, receive expert testimony . . . on the actual value to the class members of

22   the coupons that are redeemed." 28 U.S.C. § 1712(d).

23        Here, the parties have provided no evidence that would allow this court to make any

24   reasoned assessment of the actual value of the settlement to the class members or of the value of

25   the claims to be surrendered. Such lack of evidence is alone grounds for denying final approval, as

26

1    the court is simply unable to fulfill its duty to the settlement class under Rule 23 and CAFA.

2    Regarding the estimated value of Plaintiffs' claims, it need not be determined with

3    precision. *See Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). "In reality,

4    parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement

5    by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the

6    chances of obtaining it, discounted to present value." *Id.* Nonetheless, in this case the court cannot

7    even begin this inquiry, for the parties have failed to provide the court with evidence of even the

8    total amount of airport concession recovery fees that were charged to the class members, let alone

9    potential ranges of recovery and the chances of obtaining it. Although there is a reference to $70

10   million in Plaintiffs' motion for final approval, Plaintiffs are silent on the evidence or methodology

11   behind that figure. Doc. #185, p. 12. Without evidence of the actual amount of damages at stake,

12   the court is unable to make any reasoned assessment of the value of the claims.

13   As for the actual value of the coupon settlement to the class members, the record is only

14   slightly more developed and still woefully deficient. The face value of the coupons ($10 and $20,

15   depending on number of rentals) is evident from the settlement terms. Also, Defendants have

16   provided figures from the claims administrators regarding the numbers of registrations and opt-outs

17   received prior to the fairness hearing (as of mid-April, nearly 84,000, or 3.36% of the nearly 2.5

18   million member class). From that number, it is possible to make some reasoned prediction as to the

19   total number of registrations likely to be received by the deadline, sixty days following the fairness

20   hearing. Class Counsel reasonably estimates at least 100,000 (or 4% of the class). Doc. #233-1, p.

21   2.

22   No figures have been provided, however, as to the breakdown of registrants entitled to $10

23   or $20 coupons, despite the likely availability of such figures from the claims administrators and

24   the necessity of such figures for estimating the total face value of all coupons to be distributed.

25   Instead, when questioned at the fairness hearing, Defendants could offer only that roughly 90-95%

26

17

of the class consists of members with one or two rentals, making them eligible for $10 coupons, with the remainder eligible for $20 coupons.  Doc. #246, pp. 25, 39.  Assuming the registration percentages numbers correlate to the makeup of the class, approximately 90 to 95 thousand class members would receive $10 coupons, and 5 to 10 thousand would receive $20 coupons.  Thus, the total face value of coupons issued to 100,000 registrants would be approximately $1.05 million to $1.10 million.

But that is only the coupons' face value, not their actual value to the class.  Coupons are inherently worth less than cash, particularly where as here the coupons have no cash value, transferability is substantially restricted, and redemption rates can vary widely and may be particularly low in cases involving low-value coupons.  *See True*, 749 F. Supp. 2d at 1075.  The parties argue that these coupons may be redeemed at significant rates because the coupons are valid for 18 months, may be redeemed not just in Nevada but at any of the issuer's domestic locations, and may be redeemed in conjunction with other discounts.  That may well be correct.  However, the court has been presented with no evidence whatsoever as to what those redemption rates might actually be.  Because redemption rates have a direct and potentially devastating impact on the actual value received by the class, such lack of evidence prevents any reasoned assessment of the settlement's actual value to the class.

The fact that these coupons are redeemable along with all other discounts does factor positively into the value of these coupons.  But they are still coupons and therefore cannot be legitimately taken at face value.  *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 390 (C.D. Cal. 2007).  "[C]ompensation in kind is worth less than cash of the same nominal value."  *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001).  "Since rebates and coupons aim to facilitate a sale to a purchaser who would not otherwise purchase a product at a higher price, the Court cannot . . . assume that every sale to a class member 'would have happened anyway.'"  *True*, 749 F. Supp. 2d at 1075.  Class members may redeem their coupons with the issuing defendants

"only 'because they fe[el] beholden to use the certificates,' not because they would have otherwise. *Id.* (quoting *In re GMC*, 55 F.3d at 808).  In this way "coupons serve as a form of advertising for the defendants, and their effect can be offset (in whole or in part) by raising prices during the period before the coupons expire." *In re Mexico Money*, 267 F.3d at 748.  Moreover, as for these coupons in particular, the court seriously questions the value of $10 or $20 on a car rental in light of the fact that consumers can readily find similar discounts in tour magazines that proliferate in tourist destinations like Reno and Las Vegas—and without surrendering potentially valuable legal claims.

For many of the same reasons, the coupons are also less costly than cash to the Defendants. *See True*, 749 F. Supp. 2d at 1075.  Indeed, "[r]ather than resulting in [the] Defendant[s] disgorging any wrongfully obtained gains, the result will likely be increased [business] . . . ." *Figueroa*, 517 F. Supp. 2d at 1327.  The coupons here are non-transferrable, non-sellable, and may only be redeemed with the issuing defendant.  Thus, in order to obtain the benefit of the settlement coupons, the individual class members would be forced to do additional business with the very defendants that wronged them.  For each class member who rents another car from the coupon issuer who would not have done so absent the coupon, that Defendant "will experience a net benefit." *True*, 749 F. Supp. 2d at 1075.  "Thus, rather than providing substantial value to the class, the certificate settlement might be little more than a sales promotion . . . ." *In re GMC*, 55 F.3d at 768.

Defendants have taken the express position that they would rather litigate than agree to a cash settlement. *See* Doc. #246, p. 64.  Of course, that is their right to do.  It is also their right to assert that the claims against them are weak and unworthy of compensation.  But in the absence of probative evidence regarding the actual value of the coupons offered in settlement, Defendants' position is telling.  If Defendants are not willing to agree to any cash settlement but they are willing to issue $10 and $20 coupons, perhaps the actual value of the coupons is nothing at all.

Of course, Defendants have agreed to cash outlays in other forms, including payment of costs of notice and administration and, subject to court approval, attorneys' fees, litigation

19

1  expenses, and incentive awards.  While the value of such items may accrue to the class' benefit

2  only indirectly, it is nevertheless appropriate to consider all provisions in the settlement to fulfill

3  the court's duties in assessing the fairness of the proposal and protecting the interests of the class.

4  *See True*, 749 F. Supp. 2d at 1077.  The court has not been provided with figures on the costs of

5  notice and administration, aside from Class Counsel's "understand[ing]" that such costs to date

6  "exceed $750,000."  The other figures are known.  Defendants have agreed to pay, uncontested, up

7  to $1.44 million cash in the form of attorneys' fees and costs to Class Counsel, and $20,000 in

8  incentive awards to the Class Representatives.  In turn, Plaintiffs have requested the maximum.

9  *See* Doc. #186.

10      Putting aside for a moment the court's concerns expressed above and valuing the coupons at

11  face value (as calculated above, approximately $1.1 million) with an unrealistic 100 percent

12  redemption rate, the total cost to Defendants would total approximately $3.31 million.  Based on

13  nearly 2.5 million class members, that equates to approximately $1.324 in costs per class member,

14  not including revenues from repeat business.  By comparison, Plaintiffs' unverified figure of $70

15  million in concession recovery fees collected divided by 2.5 million class members averages to $28

16  per class member.  Based on these figures the discount on Plaintiffs' claims is 95 percent.

17  Considering that this figure was arrived at by taking all facts and assumptions in the light most

18  favorable to the settlement, disregarding basic economics, and assuming that Defendants' costs

19  equate to the class members' benefit, the real discount is likely greater.  By comparison, under the

20  clear sailing provision, Class Counsel's fees request has been discounted by less than 8 percent, and

21  even then results in an hourly rate exceeding $400.

22      As in *True*, 749 F. Supp. 2d at 1078, of all of the components of the settlement, the only

23  components with any determinate—or on this record, determinable—value are the attorneys' fees,

24  incentive payments, and to some extent the costs of notice and administration.  Furthermore, to the

25  extent the value of the settlement to the class can be assessed, it is heavily discounted, if not

26

20

1    altogether nominal, whereas Class Counsel is seeking, uncontested, $1.44 million in fees and costs

2    under a "clear sailing" provision, regardless of how many class members register or redeem

3    coupons.  Faced with similar circumstances, the *True* court held that "to award three million dollars

4    to class counsel who may have achieved no financial recovery for the class would be

5    unconscionable."  *Id.*  Here, the requested award is not quite half that amount; however, the same

6    concerns apply.

7           For the foregoing reasons, the court concludes that there is no basis upon which the court

8    might find that this settlement produces "real value" for the class, as Class Counsel has urged.  On

9    this sparse record, the settlement appears to have real value only for Class Counsel, the Class

10   Representatives, the claims administrators, and the Defendants.

11                **5.       Extent of Discovery Completed, and Stage of the Proceedings**

12          At the time of settlement, the court had entered partial summary judgment as to Hertz, but

13   not as to Enterprise and Vanguard.  Plaintiffs had also moved for class certification against Hertz,

14   but the motion had not been fully briefed and was stayed pending settlement.  Finally, discovery on

15   damages had only just begun between Plaintiffs and Hertz, and apparently no discovery on damages

16   had begun with any other defendants.

17          Plaintiffs tout the advanced stage of the proceedings as weighing in favor or settlement.

18   Plaintiffs note that, *inter alia*, discovery has been completed as to liability, and the court has ruled

19   on a motion to dismiss and cross-motions for summary judgment.  *See* Doc. #185, pp. 13-14.

20   Conspicuously absent from Plaintiffs' assessment, however, are the facts that the court ruled in

21   Plaintiffs' favor as to liability under NRS § 482.31575, and virtually no discovery has been

22   conducted as to damages.  Yet the damages issue is central to the parties' arguments regarding the

23   reasonableness of the settlement based on the purported weakness of Plaintiffs' case, despite

24   having won partial summary judgment on liability.

25          Because discovery on damages was in its infancy at the time of settlement, it is highly

26

1  questionable whether Plaintiffs have sufficient information to make a fully-informed assessment of

2  the strengths, weaknesses and value of their case going forward.  Indeed, as discussed above, given

3  the parties' failure to present evidence regarding the value of the claims Plaintiffs would be giving

4  up if the settlement were to be approved, the court itself is unable to determine whether the value of

5  the settlement is reasonable in relation to the value of the claims surrendered.  Thus,

6  notwithstanding the advanced stage of these proceedings—and in some sense, because of it, given

7  Plaintiffs' success on the only issue for which discovery has been conducted—the court finds this

8  factor weighs against approval.  *See Figueroa*, 517 F. Supp. 2d at 1328 (reaching the same

9  conclusion where the settlement had been negotiated before class certification and while the

10  plaintiffs had been denied merits discovery, leaving them with "insufficient information . . . to

11  adequately evaluate the merits of the case and weigh the benefits of settlement against further

12  litigation").

13              **6.**    **Experience and Views of Counsel**

14        Class Counsel represent that they have extensive experience in complex class actions, and

15  that Defendants are also represented by counsel with extensive experience.  Furthermore, the

16  settlement was achieved in part with the assistance of an experienced mediator and former judge,

17  who has issued a declaration stating that "[t]he mediation involved many complex and difficult

18  issues," that "counsel for all parties vigorously represented their clients interest," that the settlement

19  "is the result of arm's-length negotiations," and that he believes the "innovative" settlement

20  package "is well-tailored to the strengths and weaknesses of all parties' positions."  Doc. #233-1,

21  pp. 1-2.  Such factors weigh in favor of settlement approval.

22        Some objectors assert, however, that the settlement appears to be a so-called "lawyer's

23  bargain," whereby Class Counsel has agreed to a coupon settlement of nominal value to ensure

24  recovery of their own fees and expenses.  Lending some credence to that accusation is the fact that

25  Class Counsel have advocated for approval of the settlement based on the purported weakness of

26                                                      22

the claims and the substantial risks of further litigation, yet the class members alone would bear virtually all of the attendant discount on their settlement recovery.  While the class members receive coupons of questionable actual value, Class Counsel has requested for itself an uncontested cash award of $1.44 million in attorneys' fees in costs based on a lodestar, rather than on the value of the class recovery, with only a modest discount from the claimed lodestar amount.  In other words, the class is being asked to "settle," yet Class Counsel has applied for fees as if it had won the case outright.

Seeking to rebut the accusation of a lawyer's bargain, Class Counsel assert they insisted on negotiating the settlement terms for the class prior to negotiating their recovery of fees and expenses.  *See* Doc. #233, pp. 5-6.  Generally, the separate negotiation of the class recovery and attorneys' fees does tend to mitigate the potential conflict of interest between counsel and the class. In this case, however, that principle is undermined by the settlement's inclusion of a clear sailing provision on attorneys' fees and by Class Counsel's position that fees should be calculated and awarded without regard to the value of the class recovery.  This restores to at least some degree the conflict of interest that separate negotiation of the class recovery and attorneys' fees is supposed to achieve.  If counsel could count on attorneys' fees being awarded without regard to the value obtained for the class, it would diminish class counsel's incentive to maximize the class' recovery and instead incentivize a quick settlement with minimal recovery to the class.  Moreover, in light of the fact that defendants are concerned only with the total expense of the settlement, rather than where the recovery goes, class counsel's acceptance of a lower settlement amount increases the chances of negotiating a clear sailing provision with a higher cap on attorneys' fees and costs.

Ultimately, the best evidence for rebutting the accusation of a lawyer's bargain is to show that actual value has been obtained for the class relative to the strength and value of the claims surrendered.  As already discussed, however, such evidence has not been presented in this case.

**7.      Presence of a Governmental Participant**

23

1    No governmental entity has filed any objection to the settlement terms or sought to

2    participate.  The two governmental entities that have responded—the United States, and the Nevada

3    System of Higher Education—have sought to exclude themselves and their employees and

4    contractors on statutory and constitutional grounds without expressing any opinion on the

5    reasonableness of the settlement terms.

6    **8.      Reaction of Class Members to the Proposed Settlement**

7    According to the Defendants' submissions prior to the Fairness Hearing, responses to the

8    nearly 2.5 million notices sent out have been as follows: (a) objections number approximately 66,

9    or 0.003% of the Class; (b) opt-outs number less than 5,000, or 0.2%; and (c) registrations total

10   nearly 84,000, or 3.36%.  The settlement parties argue this suggests minimal opposition and

11   widespread support for the settlement.

12   Several observations cut the other way, however.  First, the parties avoid mentioning the

13   substantial rate of non-responsiveness by the class—over 96%, or 2.411 million people.  Second,

14   the negative responses are touted by the parties as indicating minimal opposition in relation to the

15   size of the entire class.  In relation to the number of total responders, however, 5.6% of 89,000

16   responders opted out.  Third, in assessing the Class' reaction, courts look not only to the number

17   but also the "vociferousness of the objectors," *In re GMC*, 55 F.3d at 812, which in this case has

18   been strong.  Fourth, given the practical realities of class settlements, courts should be more

19   cautious about inferring support from a small number of objectors.  This is particularly true where

20   the settlement benefits are small, and where notice of the action and the settlement occur

21   simultaneously, giving the appearance of a *fait accompli*.  *See id.*

22   The settlement parties attempt to dismiss many of the objectors arguments on the basis that

23   they are confused about what the settlement does and does not provide, and that they fail to

24   consider or address the purported weakness of the Plaintiffs' case.  To the extent the objectors rely

25   on objectively erroneous arguments (e.g., whether the attorneys' fees would reduce the award to the

26

class), the objections are not entitled to weight.  However, as already discussed, the court also finds

that some objectors have raised legitimate and serious concerns about the value of the settlement to

the class relative to the value of the claims surrendered.  Given the settlement parties' failure to

provide such evidence in support of the settlement, their dismissal of the objectors' arguments rings

hollow.

At bottom, the court concludes that the absence of evidence as to the actual value to the

class of the coupons offered in settlement and the value of the claims surrendered precludes any

finding that the settlement is fair, reasonable, and adequate under either Rule 23(e) or 28 U.S.C. §

1712(e).  The court further rejects the notion that the claims are so weak as to render the settlement

fair, reasonable, and adequate notwithstanding the lack of evidence as to the value of the

settlement.  Plaintiffs' Motion for Final Approval of the Settlement (#185) will therefore be denied.

**IV.   Motion for Attorneys' Fees, Expenses and Incentive Awards**

Given the court's denial of final approval of the settlement, Plaintiffs' Motion for

Attorneys' Fees, Expenses, and Incentive Awards to the Class Representatives (#186) will be

denied as premature.

**V.   Exclusion of Governmental Entities and Employees**

The United States and the Nevada System of Higher Education ("NSHE") have each

requested exclusion from the settlement class of the governmental entities and their employees and

contractors who were reimbursed for work-related car rentals involving the payment of unbundled

concession recovery fees.  The United States essentially asserts that 28 U.S.C. §§ 516-19 precludes

its participation as a member of a class represented by private counsel, and that any claims for

damages for fees unlawfully charged to its employees and contractors for work-related activities

would accrue to the government upon reimbursement.  *See* Doc. #243.  By comparison, NSHE

objects to this court's jurisdiction and requests exclusion for itself and its employees on the ground

that, absent an express waiver, Eleventh Amendment sovereign immunity bars involuntary joinder

of the state or its employees in their official capacities, whether as plaintiffs or defendants.  *See*

Doc. #203; Doc. #237; *Thomas v. FAG Bearings Corp.*, 50 F.3d 502, 505-06 (8th Cir. 1995);

*Walker v. Liggett Grp., Inc.*, 982 F. Supp. 1208, 1210-11 (S.D. W.Va. 1997).  Plaintiffs have

agreed to exclude the governmental entities but oppose the exclusion of their employees and

contractors.  *See* Doc. #223, p. 2 & n.2.

Given the court's denial of final approval of the settlement, it is unnecessary at this time to

determine the propriety of including individual employees of NSHE and the United States in the

settlement class.  Pursuant to the court's order granting Plaintiffs' motion for conditional class

certification, "certification of the Settlement Class is contingent on and for the purposes of

settlement only.  If the Settlement does not become final for any reason, Plaintiffs and Defendants

shall be restored to their respective positions as if no settlement had been reached."  Doc. #135, p.

4.  In other words, absent final approval of the settlement, there is no Settlement Class from which

anyone might be excluded.  Should the plaintiffs file a renewed motion for approval of the

Settlement Agreement or file a separate motion for class certification, the parties shall address these

issues at that time.

**VI.    Objector's Motion to Intervene**

Among the Settlement Class members who have filed written objections to the proposed

settlement, objector Scott Schutzman also has moved to intervene.  Essentially, Schutzman finds

the coupon settlement inadequate, and he contends that intervention is necessary to protect his

interest because approval of the settlement would leave him without any satisfactory remedy.

Given the court's denial of final approval of the settlement, the primary basis upon which

Schutzman seeks intervention—opposition to the settlement—has now been resolved in his favor.

Furthermore, that disapproval has materially altered the procedural posture and course of this

litigation, and Schutzman's briefing does not address his interest in or the grounds for intervening

in these circumstances.  For these reasons, the Motion to Intervene (#199) will be denied without

26

prejudice.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Final Approval of the Settlement (#185) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Attorneys' Fees, Expenses, and Incentive Awards (#186) is DENIED as moot.

IT IS FURTHER ORDERED that Objector Scott Schutzman's Motion to Intervene (#199) is DENIED without prejudice.

IT IS FURTHER ORDERED that notice of the court's denial of settlement approval and a copy of this order shall be posted on the settlement website. Defendants shall also provide notice of the court's denial of settlement approval, as well as instructions on how to obtain a copy of the court's decision from the settlement website, to all class members who have responded, including registrants, opt-outs, and objectors.

IT IS SO ORDERED.

DATED this 27th day of June, 2011.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE